LIBERTY COUNSEL
Mathew D. Staver
Daniel J. Schmid (Local Counsel)
Va. Bar #84415
P.O. Box 11108
Lynchburg, Virginia 24506-1108
dschmid@LC.org
(800) 671-1776

WINSTON & STRAWN LLP
Jeffrey L. Kessler (Lead Counsel)
David G. Feher
Timothy M. Nevius
Rebecca L. Seif
200 Park Avenue
New York, New York 10166
(212) 294-6700

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| LIBERTY CHRISTIAN ACADEMY, | Honorable |
| Plaintiff, | Civil Action No. __ CV ___________ |
| v. | |
| VIRGINIA HIGH SCHOOL LEAGUE, INC., | **COMPLAINT AND JURY DEMAND – SEEKING INJUNCTION AND DAMAGES** |
| Defendant. | |

Plaintiff, by its undersigned attorneys, for its Complaint herein, alleges as follows:

**INTRODUCTION**

1. The Defendant in this action, Virginia High School League, Inc. ("VHSL" or the "League"), through its Virginia public high school members, has entered into agreements that restrain competition in the markets for the commercial exhibition of Virginia high school football and basketball contests to exclude competition from non-public high schools such as Plaintiff Liberty Christian Academy ("LCA"). Those restrictions are a blatant violation of the antitrust laws, have no legitimate pro-competitive justification, and should be struck down and enjoined.

2. The Defendant's rules expressly ban non-public school membership in the VHSL, the premiere state-wide high school athletic league, and thus, with limited exceptions, ban LCA and other non-public schools from participating in commercial athletic contests with VHSL members, including in the football and basketball markets described in more detail below. Non-public high schools in Virginia, such as LCA, are therefore excluded from competing with VHSL members in a classic group boycott.

3. Defendant's concerted refusal to deal with LCA insulates its members from commercial competition with LCA and other non-public schools that, absent these restraints, would challenge the market power and competitive commercial position of VHSL members. As a result of Defendant's anticompetitive agreements, Plaintiff (as well as other non-public high schools in the relevant market) has suffered significant antitrust injury.

4. This injury includes the fact that LCA and other non-public high schools have received, and will receive, less revenue for the exhibition of their high school football and basketball contests than they would receive in a competitive market. Consumers of the

commercial exhibition of high school football and basketball contests in Virginia have also been harmed by the suppression of economic competition and the reduction in the quality of high school football and basketball contests in Virginia, especially in local rivalry games, caused by the unlawful restraints.

5. These agreements to boycott LCA and any other nonpublic high schools from engaging in commercial transactions in public exhibitions of, among other contests, high school football and basketball events with VHSL members, and to punish any VHSL member who refuses to comply with the group boycott, are *per se* illegal acts under Section 1 of the Sherman Antitrust Act. They also constitute an unreasonable restraint of trade under the rule of reason, whether under a "quick look" or full-blown rule of reason analysis, and violate the Virginia Antitrust Act.

6. Defendant cannot justify this group boycott. Upon information and belief, forty-seven (47) other states in the nation already permit non-public high schools to regularly participate in commercial athletic contests with public high schools, so VHSL cannot make any credible argument that its group boycott is necessary or that less restrictive alternatives for achieving any legitimate pro-competitive purposes are unavailable.

7. This action is brought to permanently enjoin violations by Defendant of the federal and state antitrust laws. A permanent injunction is the only relief that can bring these unlawful restrictions to an end. Plaintiff also seeks to recover treble damages resulting from these violations.

**JURISDICTION AND VENUE**

8. These claims arise and are brought under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and the Virginia Antitrust Act, Virginia Code § 59.1-9.5.

9. This Court has jurisdiction pursuant to 15 U.S.C. §§ 4 and 15, and 28 U.S.C. §§ 1331, 1337 and 1367, in that this action arises under federal antitrust laws.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22.

11. Defendant is headquartered and transacts business in the Western District of Virginia, and the unlawful activities were and continue to be carried on in part by Defendant and its members within this district. The Western District of Virginia is home to scores of public high schools that are VHSL members and have agreed to boycott Plaintiff in these economic transactions.

12. Plaintiff is located in the Western District of Virginia along with several other non-public high schools that are excluded from membership in the VHSL.

13. Defendant and Plaintiff both earn revenue from the exhibition of high school football and basketball contests that are conducted, and from commercial sponsorship and other agreements relating to their football and basketball contests that are performed, in this district.

**THE PARTIES**

14. LCA is a non-public high school located in Lynchburg, Virginia. LCA sponsors numerous high school athletic teams, including football and basketball teams, and currently participates as a member of the Virginia Independent Schools Athletic Association ("VISAA"), a nonprofit organization comprised of Virginia non-public high schools that are excluded from VHSL membership.

15. Pursuant to VHSL rules, Plaintiff is barred from membership in the VHSL and, as a result, is barred, with limited exceptions, from participating in commercial transactions with VHSL members in the commercial markets for the exhibition of high school football and basketball contests. LCA cannot regularly schedule the highest quality opponents, especially

from local areas, to participate in football and basketball contests exhibited to the public due to its exclusion from the VHSL. LCA also is excluded entirely from participating in state championship games with VHSL schools, insulating VHSL members from economic competition in the most prominent exhibitions of high school football and basketball contests in Virginia.

16. Plaintiff must resort to scheduling teams of lower quality, and often hundreds of miles away, including from out of state, to engage in high school football and basketball contests. LCA has suffered significant lost revenue by virtue of VHSL's group boycott, including by VHSL members in the Lynchburg, Virginia area. Further, due to the illegal restrictions, Plaintiff may not participate in public exhibitions of playoff contests that are organized by Defendant, generate substantial revenue for VHSL members, and constitute Virginia's premier high school football and basketball exhibitions.

17. According to its handbook, Defendant VHSL is a non-governmental corporation with a membership comprised of "the public high schools in the Commonwealth of Virginia." VHSL conducts high school athletic activities, primarily publicly exhibited athletic contests. Defendant maintains its headquarters and principal place of business at 1642 State Farm Boulevard, Charlottesville, Virginia.

18. The VHSL and its members are engaged in interstate commerce in the business of, among other things, selling tickets to publicly exhibited high school football and basketball contests to residents from several states, selling telecast rights to national television and radio networks and stations for football and basketball contests, and selling corporate sponsorships to companies located throughout the United States for, among other things, high school football and basketball contests.

## NATURE OF INTERSTATE TRADE AND COMMERCE

19. Defendant and its members are engaged in the businesses of, among other things, operating publicly exhibited high school football and basketball contests in Virginia's premier high school athletic league, including the sale of tickets and telecast rights for such contests. To conduct this business, the Defendant's members would, absent the restrictions at issue in this action, engage in transactions with Plaintiff and other non-public high schools that would enable them to generate greater amounts of interstate revenue from fan attendance, sponsorship agreements, and broadcast agreements.

20. The Defendant's operation of and engagement in the business of public exhibitions of high school football and basketball contests involves significant amounts of interstate trade and commerce, including, inter alia, the following interstate activities: travel; communications; purchases and movement of equipment; telecasts of games; advertisements; commercial communications on the internet and other media; promotions; sales of tickets and concession items; sales of merchandise and apparel; programs and other publications; sponsorships; fundraising; conferences and clinics; employment of coaches and administrative personnel; employment of referees; and negotiations for all of the above.

21. On information and belief, the aforesaid interstate transactions of Defendant and its members involve at least tens of millions of dollars in collective annual expenditures and receipts.

## THE ILLEGAL AGREEMENTS TO RESTRAIN COMPETITION

22. The anticompetitive agreements of Defendant and its members are documented in the VHSL Handbook. The rules at issue in this Handbook constitute horizontal agreements among commercial competitors in that they are proposed, drafted, and agreed upon by VHSL

members that compete with each other off-the-field for ticket, sponsorship, and other revenue. The VHSL anticompetitive rules are strictly enforced, so that member institutions have no choice but to comply with them or face penalties, including monetary fines and zero points towards their qualification for the VHSL playoffs.

23. Plaintiff challenges, as illegal agreements, all VHSL rules that prohibit Plaintiff and other non-public high schools from joining the VHSL and participating, with only limited exceptions, in the public exhibition of regular season and playoff football and basketball contests with the public high school members of the VHSL. These rules include, but are not limited to, VHSL Bylaw 8-1-1 and Rule 27-13-1.

24. VHSL members, and their representatives on the VHSL Executive Committee, agree upon these restraints. The Preface to the VHSL Handbook states, "By 1926, the League realized that, in the interest of democracy, the legislative responsibilities of the League should be vested in representatives of member high schools. All activities were coordinated under one organization … Governance was restructured in 1995 to make the Executive Committee the chief legislative body with its action subject to review by the membership." VHSL Bylaw 12-4-1 provides that: "The Executive Committee shall be empowered to initiate such action as it may deem necessary or advisable in the best interests of the League, including all legislative powers … [and] establish all policies and procedures for all state level activities." Bylaw 12-4-2 states that: "The rules and regulations for which the Executive Committee shall be responsible, and for which it shall have full power and authority to enforce, include the By-laws, eligibility regulations and all rules found in this Handbook."

25. According to VHSL Bylaw 12-1-1, the Executive Committee is "composed of 31 voting members including: one principal from each region, at each group level (1A, 2A, 3A, 4A,

5A, 6A) for a total of 12 principals; one representative from the State Department of Education; eight division superintendents of schools; one representative from the Virginia School Boards Association; one Virginia citizen appointed by the Executive Committee from the PTA Board of Managers; six supervisors of athletics/activities at a member school, one from each group level (1A, 2A, 3A, 4A, 5A, 6A); and two members of the Virginia General Assembly."

26. Only Virginia public high schools are eligible for membership in the VHSL. VHSL Bylaw 8-1-1 expressly provides that only "State public high schools in Virginia with the expressed written authority of their respective school boards shall be eligible for membership in the League."

27. VHSL members are prohibited from participating in the exhibition of any athletic contests, including football and basketball games, against LCA and other non-public schools without the consent of the VHSL Executive Committee. Moreover, the Executive Committee would not consent to LCA or other non-public schools ever participating in football or basketball contests as VHSL members.

28. VHSL Rule 27-13-1 provides that: "No member school shall engage in athletic competition: (1) With a Virginia public high school that is not a member of the League without the authorization of the League's Executive Committee." VHSL Rule 27-13-3(5) provides that: "Athletic competition with 'outside' or 'independent' teams must be approved by the Executive Director and is not recommended when sufficient competition can be scheduled with member schools." Moreover, even if consent were granted for a particular game, competition against a non-member school is still prohibited unless such school agrees to a set of special regulations. VHSL Rule 27-13-2 thus provides that: "Upon being informed as to whether a Virginia non-public secondary school (private, preparatory, parochial, etc.) agrees to abide by the special

regulations governing non-public schools, League member schools may decide whether or not to compete with that non-member school." Appendix B of the VHSL Handbook sets forth the "special regulations governing non-public schools," including specific age and eligibility requirements for the students of the non-member schools. Moreover, under the rules of the VHSL, a non-public school may not join as a member and thus could not be a part of any high school football or basketball league in which the public high schools of Virginia are engaged. (VHSL Bylaw 8-1-1). Thus, high schools excluded from the VHSL are absolutely barred from participating in the VHSL state championship playoffs, the most prominent high school football and basketball contests in Virginia.

29. The above VHSL rules are a horizontal agreement among competitors to boycott LCA and other non-public high schools from commercial football and basketball contests with VHSL members. Each year, the VHSL and its membership re-enact these rules and thereby renew their illegal agreements with new affirmative acts in a continuing conspiracy in restraint of trade.

30. The VHSL has twice denied LCA requests that VHSL change its rules prohibiting non-public school membership. On February 7, 2006, LCA applied for admission to the VHSL, but the VHSL denied that request.

31. On April 4, 2008, LCA once again requested that it be permitted to join the VHSL, following discussion with VHSL officials. LCA advised the VHSL that its request was based on LCA's compliance or willingness to comply with VHSL rules (apart from the ban on private school membership that would be lifted), with a request that LCA be subject to a multiplier for purposes of categorizing the school consistent with how the multiplier mechanism is used in other states, and with consideration of LCA's desire to continue to enroll students from

the City of Lynchburg and its surrounding counties. LCA's request was formally presented to the VHSL Executive Committee on September 18, 2008, after LCA made a presentation supporting its request to the VHSL Policy Committee. However, the VHSL Executive Committee utterly rejected LCA's proposal, with not even one VHSL representative willing to move to even have a discussion of LCA's proposal, much less conduct an actual vote to break the boycott and change the VHSL ban on non-public school membership. Each year thereafter, the VHSL and its member schools have renewed and agreed again to continue their concerted refusal to deal with all non-public schools in Virginia, including LCA, causing new and accumulating antitrust injuries to LCA.

32. The VHSL anticompetitive agreements are strictly enforced to punish any VHSL members that do not adhere to these restraints. VHSL Rule 26-4-1 provides that: "League member schools and their individual and team representatives are required to observe and comply implicitly with both the spirit and the letter of all League rules and regulations." Additionally, VHSL Rule 27-13-3 (2) provides that: "Member schools may not waive any League rule or regulation by mutual agreement with an opponent. Such action renders all member schools involved liable to disciplinary action." Further, VHSL Bylaw 15-2-3 provides that: "The Executive Director shall be authorized and required to interpret, enforce and apply League rules and regulations and to impose such penalties as are specifically authorized and enacted by the Executive Committee." Accordingly, all VHSL members are forced to abide by the illegal restraints as co-conspirators with Defendant or face punishment.

33. VHSL Rule 30-2-1 provides that: "When League rules and regulations have been violated, penalties may be imposed on the offending school by the appropriate District Committee (or by the appropriate District Council in those instances where the District



Case 6:14-cv-00018-NKM-RSB Document 1 Filed 06/02/14 Page 10 of 29 Pageid#: 10

Committee elects to refer violations to the District Council for decision), or by the Sportsmanship Committee for violations of the Sportsmanship Rule, and by such interDistrict Committees as may be appointed by the chairman of the League to decide cases involving interDistrict, intergroup and non-member offenses. Penalties may include warning, probation, suspension and payment of a fine." Of specific relevance here, VHSL Rule 30-5-1 (4) provides that: "Violation of … the rule against competing with non-member schools … [results in a] Fine as stated below, plus such other penalty as may be imposed by the appropriate District Committee."

34. VHSL members also are required to agree to boycott any member school under suspension for violation of League rules. VHSL Rule 27-13-1 provides that: "No member school shall engage in athletic competition … (2) With any school under suspension from the League, from the comparable organization in any other state or from the National Federation of State High School Associations." Rule 30-6-1 (3) reiterates this boycott requirement: "A school suspended from the League may not meet in interscholastic competition of any kind with a member of the League or a school that is a member of another state associated with the National Federation of State High School Associations."

35. Further, VHSL members agree to refrain from joining any other organization with different rules. VHSL Rule 27-13-3 (4) provides that: "No member school shall become a member of any organization whose constitution or bylaws are in conflict with the rules and regulations of the League."

**RELEVANT MARKET**

36. This action involves two relevant markets: (i) the market for the commercial exhibition of high school football contests in Virginia; and (ii) the market for the commercial

exhibition of high school basketball contests in Virginia. These two markets are distinct from each other and from other types of athletic events in that they each appeal to a specific group of fans and consumers, and are not interchangeable with other forms of sports competition or entertainment events. Each offers a unique opportunity for high schools to conduct and exhibit football and basketball contests against teams of comparable age and skill for the fans of high school football and basketball in Virginia.

37. There are no interchangeable substitute products for the commercial exhibition of high school football and basketball contests. A fan and consumer in one of these product markets would not view another product to be interchangeable because high school football and basketball contests are unique events in which only high school athletes are eligible to play.

38. High school football and basketball contests are not interchangeable with college football and basketball contests or professional football and basketball contests, as each sport has its own fan base for football or basketball competition at a certain age and skill level. Each sport also is not interchangeable with other sports or entertainment events.

39. The two relevant markets are state-wide in scope as fans of high school football and basketball are most interested in local rivalries and do not generally follow high school teams in other states. The VHSL is comprised of hundreds of public high schools from Virginia that organize athletic contests against one another for conference, district, regional, and state championships in each sport. Fans of Virginia high school basketball and football competitions purchase tickets to attend these athletic contests in which the schools they follow participate, and also engage in related commercial transactions, including the purchasing of concessions and merchandise, and other economic activity associated with attending both home and away games. Commercial sponsors contract with the VHSL and its members to support financially the

exhibition of these football and basketball contests. A fan of Virginia high school basketball or football playoff contests would not view the playoffs for high school contests in other states to be interchangeable.

40. The VHSL restrains competition in each of the two relevant markets by excluding non-public high schools such as LCA, with only limited exceptions, from participating in publicly exhibited football and basketball contests with VHSL members. As a result, Plaintiff cannot regularly participate in football and basketball contests with the highest quality and highest revenue teams in Virginia, with teams that have the greatest local rivalry interest for Virginia high school football and basketball fans, and with schools competing in the VHSL playoffs for football and basketball, which are themselves commercial contests with unique fan interest and revenue-generating potential.

41. As a result of VHSL's concerted refusal to deal with LCA and other non-public Virginia high schools, output of games and quality of competition is reduced in each of the two relevant markets, causing significant anticompetitive effects and consumer injury.

**THE COMMERCIAL BUSINESS OF EXHIBITING VIRGINIA HIGH SCHOOL FOOTBALL AND BASKETBALL CONTESTS**

42. The exhibition of high school football and basketball in Virginia are substantial commercial enterprises. According to its most recently available tax filings, the VHSL generated over $9 million in revenue in each of the last three years, including through sales of admissions and merchandise. In 2011 alone, VHSL generated $8,544,659 in "receipts from admissions, merchandise sold or services performed, or facilities furnished." Upon information and belief, much of this revenue is attributable to football and basketball, the two most popular sports from a commercial standpoint.

43. Beyond gate receipts and merchandise, VHSL contracts with commercial sponsors, including major corporations such as Wells Fargo, Subway, White House Foods, and Wilson Sporting Goods.

44. Other commercial sponsors of the VHSL include the United States Army, Allstate Foundation, The Kroger Company, The Greenbrier, Virginia College Savings Plan, Valley Health, and other Virginia and regional companies.

45. Upon information and belief, VHSL also generates revenue from telecasts of its football and basketball contests, which are streamed online via the NFHS Network, a "joint venture among the National Federation of State High School Associations (NFHS), its member state associations and PlayOn! Sports." The VHSL is one of 34 state association members of the NFHS network, which generates subscription fees from viewers around the country and potentially around the world. The NFHS website says, "Watch NFHS Network whenever you want, wherever you are! Never miss a game." The Network offers viewers subscription plans starting at $9.95 for a one-day pass, and increasing to $14.95 for a monthly pass, $49.95 for a season pass (120 days), and $89.95 for a full year, the later three of which are automatically renewed unless the subscriber cancels the plan.

46. VHSL state championship games in football similarly have been telecast on WatchESPN, including on a replay basis. These games include the Stone Bridge v. Lake Taylor AAA Division 5 championship, and the Ocean Lakes v. L.C. Bird AAA Division 6 championship game, each on December 8, 2012

47. According the VHSL's strategic plan for 2012-2015, the League plans to increase its revenue by considering the sale of "premium seating at high profile events [and] reserved, ticketed seats in sections of the arena for select basketball sessions." According to the strategic

plan, the League's number one financial goal is to "[c]ontinue to secure and increase corporate support of VHSL programs."

48. Many public high schools in Virginia, including those in and around Lynchburg—where LCA is located—also generate substantial revenues through their athletic activities and booster clubs relating to football and basketball events.

49. For instance, Brookville High School, the largest of four high schools in Campbell County and a neighboring high school that is less than 6 miles from LCA, enjoys the commercial benefits of competition in the VHSL. Brookville won the Virginia AA Division 3 Football Championship in both 2011 and 2012. Based on its most recently available tax filings, the Brookville High School Athletics Booster Club ("Brookville Boosters") generated between $30,000 and $40,000 in revenue between 2010 and 2012. As with the VHSL, a large majority of Brookville Boosters' financing comes from "receipts from admissions, merchandise sold or services performed, or facilities furnished in activities related to its purpose." Further, the Brookville Athletics Department website provides opportunities to purchase advertising space and apparel, the revenue of which benefits the athletic department.

50. Other public high schools also enjoy significant commercial benefits for their football and basketball programs as a result of their membership in VHSL. Hampton City Schools in Hampton, Virginia sells tickets and season passes for varsity football and basketball games, and has multiple corporate sponsors. Among others, the school district's website identifies Coca-Cola, Chick-Fil-A, McDonalds, and PowerAde as sponsors of the Hampton City Schools athletic programs. The website also lists many Virginia and local sponsors, including 1st Advantage Federal Credit Union, A+ Tutorial, Affordable Printing, Children's Hospital of the Kings Daughters, Coach Blizzard Tours, Colonial Gastroenterology Associates, Hampton

Chevrolet, Jason's Deli, John Smith Enterprises, Ron's Plumbing and Heating, Sportrx, and Vancostas. The website states: "HCS Athletics would like to say THANKS to our 2013 Corporate Sponsors!"

51. Upon information and belief, VHSL member Hampton High School, located in Hampton, Virginia, has won more division titles in football than any other high school in Virginia and attracts thousands of fans to its home football contests, particularly against its local rival high schools.

52. Similarly, T.C. Williams High School, a public secondary school in Alexandria, Virginia, derives substantial commercial benefits for its football and basketball programs from its VHSL membership. On its athletic website, T.C. Williams provides sponsors the opportunity to purchase advertisements for $400 per year. Upon information and belief, all of the advertising revenue goes towards T.C. Williams' athletic department. T.C. Williams was prominently featured as a Virginia high school football powerhouse in the 2000 movie "Remember the Titans."

53. Oscar Smith High School, located in Chesapeake, Virginia, also derives significant commercial benefits for its football and basketball programs as a result of its membership in the VHSL. The Oscar Smith Tigers have been Southeastern District Football Champions seven years in a row. Due to its successful football program, Oscar Smith has entered into contracts with national sports television network ESPN to broadcast its football game(s) on the ESPN networks. The home opener of the 2012 regular football season was broadcast on ESPN's main channel. Upon information and belief, Oscar Smith earned substantial revenue from the broadcast of its football game on the nation's premier cable sports network.

54. Another VHSL member, Lake Braddock High School, in Burke, Virginia, displays corporate sponsors on its website and reminds patrons that advertising revenue benefits the athletic department. Its sponsors include IHOP, Burke Athletic Club, Burke Sporting Goods, CCI Screen Printing (Athletic Apparel), Greenspring Senior Living, Northern Virginia Oral, and Maxillofacial & Implant Surgery.

55. Westfield High School, in Fairfax County, Virginia, is another VHSL member and one of the state's largest high schools. Upon information and belief, Westfield generates substantial revenue through corporate sponsorships and athletic event ticket sales relating to its football and basketball programs.

56. The commercial activity described herein is conducted by the VHSL and its member public high schools to the exclusion of Plaintiff and all other non-public schools in Virginia. Due to Defendant's unlawful restraints, LCA is barred from VHSL membership and, with limited exceptions, from participating in athletic contests with VHSL schools, the exhibition of which would generate substantial additional revenue for LCA and other non-public schools excluded from the VHSL.

57. LCA itself sells tickets to and concessions at its football and basketball games, solicits corporate sponsors and is engaged as an active competitor seeking to generate additional revenues in each of the two relevant markets for exhibiting high school football and basketball contests in Virginia. LCA is severely impeded in this commercial competition, however, by Defendant's unlawful restraints.

## LESS RESTRICTIVE MEANS ARE AVAILABLE

58. Less restrictive means are available to achieve any legitimate procompetitive purpose that VHSL may assert. Upon information and belief, all other U.S. states, other than Maryland and Texas, integrate public and non-public high school athletics. Many states apply a multiplier to determine the appropriate division or classification in which non-public schools should compete to counterbalance any potential impact of non-public schools' ability to enroll students from any geographic area. There is nothing unique about Virginia high school athletics that would prevent the VHSL from adopting a model similar to those that effectively govern high school athletic contests in 47 other states.

59. For instance, the Wisconsin Interscholastic Athletics Association (WIAA) integrated public and private schools into one athletic association in 2000. The Association website boasts that the transition was "seamless" and notes: "a united membership has strengthened the Association and has enhanced exposure, interest, excitement and uniformity to high school sports in our state. The independent and religious school members have been, as have the public school members, engaged and cooperative in compliance to the membership's rules, quality hosts for membership tournaments and willing participants in the democratic process of the membership's governance."

60. Likewise, Florida has successfully integrated public and private high school athletics. One of the nation's biggest high school football rivalries involves a public school, Lakeland Senior High School, and a private school, St. Thomas Aquinas High School. These two schools have met for the Florida 5A state title four times and are repeatedly ranked in the top 25 nationally.

61. Additionally, Plaintiff has repeatedly informed the VHSL of its willingness to abide by rules that would permit LCA to compete as a VHSL member on a level playing field against other Virginia high schools.

62. The prohibition on non-public high school membership in the VHSL has no pro-competitive purpose and cannot be justified on any claimed basis that it is necessary to promote fair on-field competition.

**INJURIES TO LCA**

63. The VHSL boycott has injured, and absent injunctive relief will continue to injure, LCA in the relevant markets.

64. Due to the unlawful VHSL restraints, LCA is required to schedule football and basketball competitions against opposing teams of lesser quality and fan interest, and that are often far removed from the Lynchburg, Virginia area, which diminishes consumer interest in the exhibition of LCA athletic events and impedes the ability of LCA to compete for revenues with VHSL member schools, especially in local rivalry games.

65. Additionally, due to such scheduling constraints, LCA has been forced to incur higher travel expenses and require its traveling athletes, staff and fans to undertake prolonged travel, which diminish revenues and consumer interest in its away games, especially when compared with scheduling away football and basketball competitions with VHSL members located near Lynchburg, Virginia.

66. For example, in 2013, the LCA football team had the following away games, at locations far from Lynchburg:

| Opponent | Location | Distance from Lynchburg, VA | Round Trip Driving Time (Google Maps) |
|---|---|---|---|
| St. Stephens & St. Agnes | Alexandria, VA | 189 Miles | 7 hours, 2 minutes |
| Providence Day | Charlotte, NC | 206 Miles | 6 hours, 56 minutes |
| Hargrave Military Academy | Chatham, VA | 45.5 Miles | 1 hour, 40 minutes |
| Blue Ridge School | Dyke, VA | 92.4 Miles | 3 hours, 34 minutes |

LCA would have scheduled games with VHSL teams located near Lynchburg, Virginia, if it was permitted to do so.

67. During the past five years, with the limited exceptions under the VHSL restrictions, LCA's football team has been able to schedule and play only a handful of games against Virginia public high schools.

68. The VHSL restraints impose similar burdens on LCA's basketball program, which is forced to schedule games with lower quality opponents, including those outside of Virginia.

69. As with its football team, during the past five years, with the limited exceptions under the VHSL restrictions, LCA's basketball team has been able to schedule and play only a handful of games against Virginia public high schools.

70. Having to participate in football and basketball contests far removed from LCA's geographic location imposes substantial burdens upon LCA's ability to compete against other Virginia high schools in the relevant markets.

71. The VHSL also recently revamped its playoff system in a way that further disadvantages non-VHSL members. Previously, football operated under six separate divisions and other sports with three divisions (A, AA and AAA), with basketball having two subdivisions within AA and A basketball. At the beginning of the 2013-14 school year, the VHSL schools were divided into six statewide classifications for postseason play strictly by enrollment from Group 1A, the smallest schools, to Group 6A, the largest.

72. For football, the sixteen (16) schools with the most VHSL points from each region compete in regional playoffs, with points awarded based on competition against other VHSL schools. Points are awarded not only for wins, but also for losses against other VHSL schools, which means that VHSL members are rewarded for losing against another VHSL team instead of seeking to play against a non-VHSL high school. This point system has created a further barrier to VHSL public high schools in Virginia agreeing to compete with non-public high schools in football, even under the rare and restrictive circumstances in which such contests had been occasionally permitted.

73. LCA's football team has been Division 1 VISAA state champions for the past three years (2011-13). However, fan interest in the VISAA playoffs is not nearly as great as in the VHSL playoffs because of the higher quality of Virginia high school football programs that are VHSL members. LCA's football program thus suffers diminished fan interest and revenues by being precluded with rare exception from playing against VHSL schools, and being barred entirely from participating in VHSL state championship playoffs.

74. LCA plays its home football games at Williams Stadium, which has a capacity of 19,200 seats. Football attendance has been well below capacity and what it would be absent the



Case 6:14-cv-00018-NKM-RSB Document 1 Filed 06/02/14 Page 21 of 29 Pageid#: 21

VHSL restraints. This has, in turn, reduced LCA revenues from attendance, concessions, and game program sales at LCA football games.

75. Because LCA has been barred from the VHSL, LCA has been unable, with rare exceptions, to schedule home games in football and basketball with public high schools in or near Lynchburg, which rivalry games would generate much greater attendance and revenue for LCA, as well as increased sponsorship revenue and consumer interest in LCA and its football and basketball teams.

76. Absent the VHSL restraints, LCA would be able to participate regularly in football and basketball contests against local public high schools and generate substantially more revenue. LCA would also be able to secure a regular schedule of athletic competitions against public high schools in and around Lynchburg in both football and basketball, and host more football and basketball competitions each year at its athletic facilities that would attract larger, paying crowds.

77. LCA would also be able to attract greater and more lucrative sponsorship agreements, benefit from higher concession and merchandise sales, and entertain regional and national broadcast opportunities currently afforded to VHSL members if not for the unlawful boycott by Defendant and its members.

78. But for the VHSL boycott, LCA would be able to compete more effectively with Virginia public high schools, which are VHSL members, in the public exhibition of its football and basketball games.

79. But for the VHSL boycott, LCA also would be able to compete in the state high school football and basketball playoffs, host high school football and basketball playoff games,

and benefit from ticket sales and other commercial activity from participating in the premier Virginia high school football and basketball tournaments.

80. The VHSL boycott also injures the ability of LCA to attract the best football and basketball student-athletes, who may choose a competing public school because of the higher level of competition and exposure in football and basketball offered by the VHSL members. This handicap in turn adversely affects the quality and revenue generating ability of LCA football and basketball contests. The negative impact on the LCA football and basketball programs also adversely affects LCA's attractiveness to non-athlete students and LCA's non-athlete enrollment.

**IMPACT ON COMPETITION IN THE RELEVANT MARKETS**

81. The VHSL restraints not only injure LCA, they also unreasonably restrain and injure competition in the relevant markets. They prevent all non-public high schools in Virginia from effectively competing in the commercial exhibition of football and basketball contests in Virginia and they therefore lead to a reduction in output and the quality of competition, and a reduction of competitive choices to consumers of Virginia High School football and basketball competitions.

82. For example, the VHSL restraints currently prohibit, with limited exceptions, LCA and other non-public schools from playing games against potential local rivals, the exhibition of which would be of great interest to consumers in the relevant markets. The VHSL boycott directly deprives consumers of superior football and basketball competitions that would be possible if not for Defendant's unlawful conduct.

83. The VHSL restraints also impair the ability of all non-public schools in Virginia to attract the best quality student-athletes in football and basketball, thereby reducing the quality of the athletic contests these institutions can offer fans.

84. In sum, the VHSL restraints impair the functioning of free markets—which operate effectively in 47 other states—that would otherwise increase the quality of play at non-public schools in various localities throughout Virginia, which are currently restrained by the VHSL boycott.

## IRREPARABLE HARM

85. The numerous anticompetitive impacts of the VHSL restraints include injuries and threatened injuries to LCA that cannot be fully compensated in monetary damages. This includes a reduction in the quality of the LCA football and basketball, a reduction in the quality of the LCA student body, injury to LCA's ability to attract the top students (not just student-athletes), and injury to LCA's reputation

86. Other injuries that Plaintiff is incurring and will continue to incur will not be fully compensable by monetary damages due to the difficulty in estimating and proving the amount of monetary damages suffered by Plaintiff as a result of the Defendant's unlawful conduct.

87. The threatened injuries to Plaintiff are irreparable, warranting the issuance of injunctive relief.

## CAUSE OF ACTION - COUNT I

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

88. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 87.

89. The restraints imposed by Defendant banning LCA and other non-public high schools from membership in the VHSL, and thereby from participating in football and basketball contests with VHSL schools, constitute an anticompetitive, horizontal agreement among competitors to boycott LCA and other non-public high schools in violation of Section 1 of the Sherman Act.

90. The restraints operate as a horizontal group boycott, which is *per se* unlawful.

91. The restraints also constitute an unreasonable restraint of trade under the rule of reason, whether under a "quick look" or full-blown rule of reason analysis. Defendant and its members collectively have market power in the relevant markets for the commercial exhibition of high school football and basketball contests in Virginia.

92. Defendant's group boycott is a naked restraint of trade without any pro-competitive purpose or effect. Less restrictive rules can be implemented to achieve any purported procompetitive objectives of Defendant and its members.

93. Defendant and its members are participants in this unlawful contract, combination, or conspiracy.

94. Plaintiff has suffered and will continue to suffer antitrust injury by reason of the continuation of this unlawful contract, combination, or conspiracy. Defendant's rules have injured and will continue to injure Plaintiff by depriving it of the ability to participate in free and open markets for the commercial exhibition of Virginia high school football and basketball contests.

95. The conduct of Defendant has caused monetary injuries to Plaintiff, entitling it to damages.

96. Monetary damages alone, however, are not adequate to compensate Plaintiff for the irreparable harm it has and will continue to suffer, warranting the issuance of injunctive relief.

**CAUSE OF ACTION - COUNT II**

**Violation of the Virginia Antitrust Act, Virginia Code § 59.1-9.5**

97. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 96.

98. The restraints imposed by Defendant banning LCA and other non-public high schools from membership in the VHSL, and thereby from participating in football and basketball contests with VHSL schools, constitute an anticompetitive, horizontal agreement among competitors to boycott LCA and other non-public high schools in violation of the Virginia Antitrust Act.

99. The restraints operate as a horizontal group boycott, which is *per se* unlawful.

100. The restraints also constitute an unreasonable restraint of trade under the rule of reason, whether under a "quick look" or full-blown rule of reason analysis. Defendant and its members collectively have market power in the relevant markets for the commercial exhibition of high school football and basketball contests in Virginia.

101. Defendant's group boycott is a naked restraint of trade without any pro-competitive purpose or effect. Less restrictive rules can be implemented to achieve any purported procompetitive objectives of Defendant and its members.

102. Defendant and its members are participants in this unlawful contract, combination, or conspiracy.

103. Plaintiff has suffered and will continue to suffer antitrust injury by reason of the continuation of this unlawful contract, combination, or conspiracy. Defendant's rules have injured and will continue to injure Plaintiff by depriving it of the ability to participate in free and open markets for the commercial exhibition of Virginia high school football and basketball contests.

104. The conduct of Defendant has caused monetary injuries to Plaintiff, entitling it to damages.

105. Monetary damages alone, however, are not adequate to compensate Plaintiff for the irreparable harm it has and will continue to suffer, warranting the issuance of injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment with respect to its Complaint as follows:

1. Declaring that Defendant's rules and agreements that prohibit LCA and other non-public high schools from participating in football and basketball contests with VHSL members, through membership in the VHSL, violate Section 1 of the Sherman Act, and enjoining said rules;

2. Declaring that Defendant's rules and agreements that prohibit LCA and other non-public high schools from participating in football and basketball contests with VHSL members, through membership in the VHSL, violate the Virginia Antitrust Act, and enjoining said rules;

3. Enjoining Defendant from restraining any member institution from participating in football and basketball contests against LCA, including in regular season, playoff and championship contests;

4. Awarding Plaintiff treble the amount of individual damages it sustained as a result of the violations of the antitrust laws alleged herein during the past four years;

5. Awarding Plaintiff its costs and disbursements in this action, including reasonable attorneys' fees; and

6. Granting Plaintiff such other and further relief as may be appropriate.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all claims and issues so triable.

/s/ Daniel J. Schmid
Mathew D. Staver*
Daniel J. Schmid (Local Counsel)
Va. Bar #84415
LIBERTY COUNSEL
P.O. Box 11108
Lynchburg Virginia 24506-1108
dschmid@LC.org
(800) 671-1776

Jeffrey L. Kessler* (Lead Counsel)
David G. Feher*
Timothy M. Nevius*
Rebecca L. Seif*
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

*Attorneys for Plaintiff*

**Pro Hac Vice Motions Pending*

Dated: June 2, 2014